A06A0203. CDM CUSTOM HOMES, INC. v. WINDHAM.
(634 SE2d 780)

MIKELL, Judge.

After a bench trial, the trial court entered a judgment granting Keith Windham specific performance of a real estate purchase contract that he entered with CDM Custom Homes, Inc. ("CDM"). CDM appeals, arguing that the trial court erred in denying its motion for directed verdict and in granting specific performance because: (1) the

contract was unenforceable because it lacked a definite purchase price; (2) Windham failed to present evidence of the fair market value of the property; and (3) the contract did not sufficiently describe the property to be sold. We affirm.

> On appeal from a bench trial, we do not retry the case. Rather, the appellate standard of review for nonjury trials of disputed material facts is the clearly erroneous test, also known as the "any evidence" rule. As such, the sole question for determination on appeal is whether there is any evidence to authorize the trial court's judgment. It is our duty to construe the evidence to uphold the judgment rather than upsetting it. This is true regardless of whether evidence also existed that may have supported the appellant's position. In the absence of legal error, an appellate court is without jurisdiction to interfere with a judgment supported by some evidence.[1]

So viewed, the record shows that on October 15, 2003, Windham and CDM entered a New Construction Purchase and Sale Agreement (the "contract") for the construction of a home located on lot 809 on Huiett Drive in the Lake Dow subdivision in McDonough, Henry County, at a purchase price of $253,000. The actual purchase price was $263,000, but the amount in the contract reflected a $10,000 credit that CDM gave to Windham in exchange for his agreement to perform all of the landscaping work and to purchase and install the HVAC units in the house. The contract also included separate special stipulations, several of which provided that the price would be determined later and added to the contract. Windham testified that the costs of the remaining stipulations were included in the purchase price. Windham tendered and CDM accepted $5,000 in earnest money in conjunction with the execution of the contract. CDM incurred a cost of $41,047.51 to purchase the lot in question.

Amy Widener Clark, CDM's exclusive listing agent, testified that she prepared the subject contract on behalf of CDM; that there was no question as to the location of the lot upon which Windham wanted his house built; that none of the parties ever complained that the lot was inadequately described in the contract; that the cost of the special stipulations that did not indicate expressly that their price would be determined later were included in the base price of $263,000; that it was not unusual for the contract to include special stipulations, the

---

[1] (Citation omitted.) *Peach Consolidated Properties v. Carter*, 278 Ga. App. 273, 274 (628 SE2d 680) (2006). See *Ellis v. Stanford*, 256 Ga. App. 294, 297 (5) (568 SE2d 157) (2002).

cost of which would be determined and added to the contract; and that the builder would provide the cost for those items. Clark further testified that once the plans came in, she attended a meeting with the owners of CDM, Darlene and Charles McKeehan, and Windham during which they "redlined"[2] the plans; that the contract was amended after that meeting on January 22, 2004, to reflect an additional cost of $3,500 for a second-story bonus room; that the redlining was consistent with the special stipulations; that there were no other change orders to the contract; that the amendment and contract, together, were the only writings that reflected the contract; that Windham returned the redlined plans to her in March; and that the projected closing date was April 30, 2004, even though the contract stated April 2003. Clark recalled that it became obvious that the house would not be completed by the projected closing date and that neither CDM nor Windham was troubled by that fact; and that after the date passed, the parties still proceeded under the belief that CDM would build the house and Windham would purchase it.

In May 2004, Clark contacted Windham and told him that the price would be increased by $35,000 due to the rise in the cost of building materials, and Windham requested a meeting. The meeting occurred on June 9 at the McKeehans's home and was attended by Darlene McKeehan, Clark, and Windham. According to Clark, during the meeting Darlene produced invoices for the lumber and concrete bills but did not give Windham specific prices of the special stipulations. Instead, Darlene demanded a contract price of $288,000, which Clark opined was a fair price, for the completion of all of the stipulations in the contract, with the exception of adding an upper level back deck. McKeehan testified that he told his wife that the new price would be $288,000 but did not tell her how he arrived at that figure. Windham did not commit to the new price but never indicated that he did not want to buy the house.

Two days later, on June 11, Windham took his friend, Michael Higgins, to see the house, and Charles McKeehan was present. Higgins testified that McKeehan measured from the front of the house to the back wall and commented, "It's just like it's supposed to be"; that Windham talked with McKeehan about trying to reduce the costs; that McKeehan was upset with Windham because Windham had talked to his brick vendor; and that McKeehan left to attend another meeting and said that he did not really have time to talk to Windham. Windham and Higgins drove back to Windham's home, and Higgins overheard a conversation that Windham and Clark had

---

[2] In this context, "redlined" means that they marked the plans to reflect the changes that Windham desired.

on a phone that allowed him to hear both sides of the conversation. He heard Clark tell Windham that McKeehan was going to return the earnest money and was not going to build the house for him. Clark testified that she called Windham later that day and told him that CDM would sell the house to him for $288,000. However, Higgins maintained that Clark did not tell Windham that McKeehan was going to sell the house at $288,000, only that McKeehan was not going to sell Windham the house.

Darlene McKeehan sent a letter enclosing Windham's earnest money and informing him that his contract had expired and that they no longer wished to do business with him, which Windham received on June 13, 2004. Darlene testified that Windham returned the earnest money to CDM. McKeehan testified that CDM sent the letter after Windham called and told him that he could not pay the $288,000, and he told Windham that he could not sell it for less.

Clark testified that near the end of July, she became aware of a contract that CDM had entered with Darlene McKeehan's sister, Deloris Slater, on July 3, 2004, to sell the house to her. The purchase price on the new contract with the Slaters was $315,000 due to upgrades they requested, according to Darlene McKeehan. On July 13, 2004, Windham filed this action for specific performance.

Slater testified that she did not learn of the dispute between CDM and Windham until she was informed by her lender, days before the closing, which was to occur on September 15, that Windham had filed a lis pendens against the house. She further testified that they did not start making improvements to the house until August and continued making improvements through October; that she met Windham on the day before Labor Day and that Windham told her that he was buying the house; that she had spent $9,500 on upgrades and still owed CDM an additional $35,000; and that the house appraised for $351,200. CDM indicated that it wished to call its appraiser, Reid Bowman, by deposition at which point the trial judge indicated that he would read the deposition. Bowman appraised the house at $355,000.

1. CDM argues that the court could not grant specific performance because the contract price was not definite, rendering it unenforceable. We disagree.

"So long as the contract for the sale of land is in writing, signed by the other parties, is certain and fair, for adequate consideration, and capable of being performed, a court of equity can decree that it be specifically performed."[3] The trial court concluded that the purchase agreement, along with the amendment, constituted a valid, binding

---

[3] (Citations and punctuation omitted.) *Bourke v. Webb*, 277 Ga. App. 749, 751 (1) (627 SE2d

and enforceable contract capable of specific performance. The evidence supports the trial court's conclusion. The contract contained a definite purchase price of $253,000. The fact that it also contained stipulations, which if agreed to by the parties, could add to the purchase price, did not render it unenforceable.[4] In fact, CDM's agent testified that it was not unusual to include items in a purchase agreement that could change the price if the parties agreed to complete those items. Thus, this enumerated error fails.

2. Next, CDM argues that granting specific performance was inappropriate because Windham did not present evidence of the fair market value of the property. Again, we disagree.

"To succeed in a claim for specific performance, the purchaser must prove the value of the property so as to enable the court to determine that the contract was fair, just and not against good conscience. And whether the price was adequate and whether enforcement of the contract was equitable are questions for the trier of fact."[5] Additionally, "[t]he fairness of the contract and the adequacy of consideration must be tested by the facts and conditions existing at the time the contract was made."[6]

The trier of fact ordered CDM to sell the house to Windham for $266,850, which reflected the original contract price, $253,000, plus $10,000 for the work that Windham did not have the opportunity to do, $3,500 for the amendment to the contract for the bonus room, and $350 for a special stipulation that was completed. McKeehan testified that $288,000 was a fair price for the house with all of the stipulations completed, but acknowledged that the special stipulations, which would have increased the purchase price, had not been completed. The only change order submitted and agreed to by the parties was in connection with the bonus room. Additionally, there was evidence that the cost incurred by CDM based on the construction invoices it provided plus the cost of the lot totaled approximately $266,000; and that the total construction loan obtained by CDM to build the house was $262,499.96. In *English v. Muller*,[7] our Supreme Court concluded that there was evidence to support the trial court's grant of specific performance where "[t]he broker testified that the contract price reflected 'top dollar' under the circumstances, based upon his review

---

454) (2006) (contract provided for adjustment in price depending on whether items were completed by closing).

[4] Id. at 750.

[5] (Footnote omitted.) *Owenby v. Holley*, 256 Ga. App. 13, 17 (3) (567 SE2d 351) (2002).

[6] (Citation and punctuation omitted.) *English v. Muller*, 270 Ga. 876, 877 (2) (514 SE2d 194) (1999).

[7] Id.

of comparable sales at the time."[8] In *Surman v. Blansett*,[9] we affirmed the grant of specific performance where the only evidence of fair market value was the opinion testimony of the purchaser that at the time the contract was executed the fair market value was approximately the same as the purchase price.[10] Therefore, in this case, there was evidence to support the trial court's determination that the contract was fair and equitable. Although CDM argues that the appraised value of the house once the Slaters' improvements were made dictates against the grant of specific performance, as stated above, the fairness of the contract must be determined based on the conditions that existed at the time the contract was executed.[11]

3. In its last enumerated error, CDM argues that the trial court erred in granting specific performance because the contract was unenforceable as it did not sufficiently identify the property. We find no error.

"To be valid, a description in a deed, contract for the sale of land, or a claim of lien on real estate must identify the land with reasonable definiteness or contain a key by the use of which the description may be applied by extrinsic evidence."[12] "However, a perfect description is not required. All that is required is that the contract furnish a key to the identification of the land."[13] "[T]he key relied upon must be sufficient to provide identification by reference to extrinsic evidence which exists at the time that the contract is entered into by the parties."[14] That "extrinsic evidence is admissible to show the precise location and boundaries of such tract. The legal sufficiency of a description is a question of law for the court."[15]

In this case, the contract described the property as follows: "All that tract of land lying and being in Land Lot 110 of the 7 District, . . . and being known as . . . lot # 809 Huiett Drive . . . McDonough, . . . 30253" and stated that it was in Lake Dow subdivision. The contract did not include the block, unit, and phase/section numbers or the number of the plat book or the page number of the book. However, Windham obtained a survey of the subject property before entering

---

[8] (Citation omitted.) Id.

[9] 246 Ga. App. 183 (539 SE2d 890) (2000).

[10] Id. at 186 (2).

[11] See *English*, supra.

[12] (Citation omitted.) *Nhan v. Wellington Square*, 263 Ga. App. 717, 721 (1) (589 SE2d 285) (2003).

[13] (Citation and footnote omitted.) *Carden v. Carden*, 276 Ga. App. 43, 47 (1) (622 SE2d 389) (2005).

[14] (Citations and punctuation omitted.) *Royal v. Bland Properties*, 175 Ga. App. 250, 251 (1) (333 SE2d 145) (1985). See also *Gateway Family Worship Centers v. H.O.P.E. Foundation Ministries*, 244 Ga. App. 286, 287-288 (2) (535 SE2d 286) (2000).

[15] (Citation and footnote omitted.) *Carden*, supra.

the contract because he attempted to purchase it on his own. In addition to showing the property's boundaries, the survey states that the "bearings shown on this plat are from Plat Book 18, Page 76." Clark testified that she had seen the survey, which had been prepared in January 2003; that there was a lot 809 in the subdivision that had specific boundaries; and that there was no question as to which property the contract referenced. Therefore, the description in the contract was a sufficient key to allow extrinsic evidence, such as the survey, to show the exact legal description of the property. This is particularly true in this case where there is no evidence that the parties were confused about the property upon which the house would be built.[16]

*Judgment affirmed. Blackburn, P. J., and Adams, J., concur.*

DECIDED JUNE 20, 2006 —
RECONSIDERATION DENIED JULY 27, 2006 — ■

*Ausband & Farr, Andrew C. Ausband, Darrell T. Farr,* for appellant.
*Smith, Welch & Brittain, John P. Webb,* for appellee.

---

[16] See *Swan Kang, Inc. v. Kang,* 243 Ga. App. 684, 689 (3) (534 SE2d 145) (2000). See also *Kay v. W. B. Anderson Feed & Poultry Co.,* 278 Ga. App. 674 (629 SE2d 408) (2006).